# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON
_____

| | | |
|---|---|---|
| **DODSON ROBERTS,** | ) | Shelby Equity |
| | ) | No. 102980-1 R.D. |
| Plaintiff/Appellee. | ) | |
| | ) | |
| VS. | ) | C. A. NO. 02A01-9506-CH-00134 |
| | ) | |
| **NATIONAL SAFETY ASSOCIATES,** | ) | |
| **INC.,** | ) | |
| | ) | |
| Defendant/Appellant. | ) | |
| | ) | |

FILED

September 4, 1996

~~Cecil Crowson,~~ Jr.
Appellate Court Clerk

From the Chancery Court of Shelby County at Memphis.
**Honorable Neal Small, Chancellor**

**Eugene J. Posdesta**,
BAKER, DONELSON, BEARMAN , Memphis, Tennessee
Attorney for Defendant/Appellant.

**Harold G. Walter,** Memphis, Tennessee
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**HIGHERS, J.**: (Concurs)
**LILLARD, J.**: (Concurs)

This is an action by Appellee, Dodson Roberts (Roberts), to recover the compensation allegedly due him from his former employer, the appellant, National Safety Associates, Inc. (NSA).

NSA hired Roberts in August 1987 to head up its foreign sales division. NSA manufactures a line of environmental products primarily for residential use and, prior to Roberts' employ was, for the most part, not involved in the international market. There is no written employment contract between the parties. They agree that the method of computing Roberts' earned compensation changed yearly due to the startup nature of the business and the initial difficulty in monitoring profitability. As explained by NSA's secretary/treasurer, Frank Swords:

> [I]t is generally felt that it is desirable for someone in a position like [Roberts] . . . to have their compensation at least partially based on the profitability of the enterprise they are operating. Since we started from ground zero, we didn't have any track record . . . as to what profits were likely to be. So, in the beginning . . . the incentive portion of the package was based entirely on sales but . . . we had to ultimately get to a place where the incentive would be based about half on sales and . . . half on profitability and it probably wouldn't be proper to make a change from the total based on sales structure [in] the beginning in one fell swoop. So, it took, . . . about four years to get there and I think that is where we were with the final package.

According to Roberts, the change in his compensation took place at the beginning of each fiscal year. Normally there were prior negotiations between the parties regarding any changes for the upcoming fiscal year. There were, however, no formal contracts memorializing the changes, only "memorandums" given Roberts outlining the changes.

NSA operates under a fiscal year beginning May 1. For fiscal year May 1, 1990 to April 30, 1991, the last full fiscal year of Roberts' employ,[1] his compensation was comprised of three parts: a base salary of $40,000 annually, a sales commission representing a certain percentage of foreign sales and a bonus equal to a minimum 75% of the sales commission to a maximum 125%. At the start of the fiscal year beginning May 1, 1991, Roberts' employment continued without any defined change, or "memorandum" by NSA detailing any changes to his current compensation plan. Roberts, however, was made aware that his current package would change. Five months into the

---

[1]Roberts' employment was terminated in March 1992.

fiscal year, on September 30, 1991, Roberts received the following memorandum from NSA:

> This is to confirm our agreement concerning your compensation arrangement for fiscal year ending April 30, 1992.
>
> 1. For the first quarter of the year (May 1, 1991 until July 31st) you will be paid on the same basis as fiscal year ending April 30, 1991.
>
> 2. Beginning August 1, 1991 you will be paid at an annual rate of $100,000.
>
> 3. Provided financial statement sales of Canada, UK, and Germany combined are $100,000,000 you will receive a bonus equal to your salary.
>
> 4. Provided sales are $100,000,000 and profit for the three countries is 10% after tax, you will receive an additional bonus equal to your annual salary.[2]

Sometime between September 27 and September 30, Roberts received a paycheck from NSA in an amount representing his sales commission for the first quarter (May, June and July) of fiscal year beginning May 1, 1991 and an adjustment of his annual salary, as reflected in the memo, to $1,925 weekly, retroactive to August 1, 1991. Roberts retained the check and continued in NSA's employ, receiving the salary outlined above until his termination.

In his complaint, Roberts alleges that he never agreed to any retroactive reduction of his compensation.[3] He seeks recovery of a bonus payment or "profit incentive," as he refers to it, for the first five months of fiscal year ending April 30, 1992 and also claims entitlement to a sales commission for the months of August and September 1991, all in accordance with the preceding fiscal year's compensation package. NSA denies that Roberts is entitled to any additional compensation. After hearing the evidence, the trial court refused to enforce a retroactive application of the September 30, 1991 memo and ordered that NSA be credited for the sums paid Roberts representing the retroactive adjustment to his annual salary. Roberts was awarded a judgment for $230,073.50, representing his "profit incentive" for May through September, 1991 and his sales

---

[2]The record reflects that Roberts' gross earnings with NSA in 1990 were $682,807.76 and $546,598.60 in 1991.

[3]Roberts does not take issue with the amount of compensation received after September 30, 1991.

commission for August and September 1991.

NSA has appealed, presenting the following issues for our consideration:

      1. Whether the trial court erred in refusing to enforce the contract agreed upon by the parties.

      2. Whether the trial court erred in awarding appellant interim payments of an annual bonus for the first five months of the fiscal year ending April 30, 1992.

We consider first the trial court's alleged error in failing to retroactively apply the terms of the September 30, 1991 memo, which was undisputedly followed by the parties from that date forward. NSA argues that the trial court failed to enforce the agreement of the parties as written and in so doing ordered the parties to "undo" their actions taken after the agreement was reached and consistent therewith. NSA relies to a great extent on the fact that Roberts accepted pay in an amount representing the retroactive salary adjustment and continued thereafter in NSA's employ. Thus, it is asserted that Roberts accepted the benefit of the offer and a binding contract resulted.

The following evidence was presented on the issue: Roberts testified that he first saw the September 30, 1991 memo on that date and that approximately a week earlier there were discussions with NSA regarding a change in his compensation package. He denied that there were any discussions that the change would apply retroactively. Roberts was questioned:

      Q.     Was there any discussion of when this compensation package was to begin?

      A.     Not that I recall, no. In fact, I went back to him after the meeting and said what about my previous earnings? Up to that time, I had really not earned anything. And he said he would look into it and then in that memo there was the thing about the first quarter and I got a check about that time too.

      Q.     But you did ask him about --

      A.     About, you know, what I had earned. I felt I had earned my commissions up to that point because they hadn't changed. Here I was five months into a fiscal year in which I had basically been operating in good faith, and I thought I had earned what I earned . . . .

Sometime around September 27, Roberts received a document from NSA concerning his "[c]ommission sale for 5-1-91 through 7-1-91," which also detailed the retroactive application of an increase in his weekly salary to 8-1-91. Roberts was asked whether he believed himself entitled to "anything additional" after receipt of the document and the paycheck which accompanied it, to which he replied, "[y]es, I thought I was due what I should have been paid for those first five months of the fiscal year at the very least." Roberts declared that at the time he received the memo, he was "halfway through a fiscal year" and "had already earned a certain amount of money."

Roberts admitted cashing the paycheck which included the retroactive salary adjustment, stating "I accepted [it] because . . . I was owed more than that." He continued, "I either accept this and take it to the bank or I could hit the street was my feeling." He further commented, "I needed a job. I didn't have another one. I needed the health insurance."

NSA's president, Jay Martin testified that there were "on going discussions" with Roberts regarding a change in his compensation package both prior to and after the end of fiscal year 1991. Martin stated that the delay in implementing the change was due to NSA's need for the year end profit figures of fiscal year 1991 before a suitable compensation package for the next fiscal year could be determined. Swords testified that the discussions with Roberts culminated in the September 30, 1991 memo. He said that there were discussions before May 1, 1991 but that at that time they did not have the "final details."

Swords was further questioned:

> THE COURT: But there was no coming together on when are we going to do this and it being these percentages and on a certain date?

> THE WITNESS: No, sir, I mean, we didn't have the percentages lined out. . . .

>          . . . .

> THE COURT: . . . . When was it agreed to or when was it just said we are going to start from today and do it differently?

> THE WITNESS: Again, it was discussed that it was going to be changed, a change was going to be made prior to 4/30/91.

The trial court ruled from the bench as follows:

> It is true that a contract can be bound by part performance or can be ratified by the party being charged. The court feels in this case, however, that in order to enforce . . . the memo dated September 30, 1991, the court would have to enforce it retroactively.
>
> . . . .
>
> The point is, though, that they had an understanding and agreement that they had been operating on for some time. There had been by the testimony of . . . Mr. Swords' . . . that there had never be [sic] a time when these parties even sat down and agreed that, . . . as of the first of the month or any certain date we are going to change this arrangement and it will be based from that point forward on this . . . . Nothing until September 30, 1991. There had been some indication that the plan would be changed, but I don't think that was sufficient. That is little more than perhaps negotiations to change the deal somewhat.
>
> The court feels that there was no definite change, no meeting of the minds of the parties on the change at least until the September 30, 1991 memo in which [NSA] notified Mr. Roberts that this is going to be the deal. It is the court's finding that that was a way of saying we are going to change the deal as of today.

It is well settled that a binding contract must result from a meeting of the minds, be based upon sufficient consideration and be sufficiently definite to be enforced. *Peoples Bank v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. App. 1991). In addition, a modification of an existing contract cannot be accomplished by the unilateral actions of one of the parties. There must be the same mutuality of assent and meeting of the minds as required to make a contract. New negotiations cannot affect a completed contract unless they result in a new agreement. *Balderacchi v. Ruth*, 256 S.W.2d 390, 392 (Tenn. App. 1952).

Our review of this matter is in accord with Rule 13(d) T.R.A.P., which provides for a *de novo* review upon the record, accompanied by a presumption of correctness of the trial court's findings of fact unless the evidence preponderates otherwise. *See, e.g., Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993). It is clear that the parties to this action never operated under a written employment agreement. Roberts was simply informed prior to the end of the fiscal year that his compensation package for the upcoming fiscal year would likely change. The uncontroverted testimony of Roberts is that such change was always enacted, prior to the year in dispute, at the

beginning of the new fiscal year. The change was documented in memoranda which accompanied Roberts' paycheck and accepted when Roberts continued working with the company. For the fiscal year in dispute, however, the changes were for the first time not implemented at the beginning of the fiscal year, but five months into it. Roberts testified that prior to the September 30, 1991 memo, the parties had never discussed a retroactive application of his salary adjustment. Nor do we find the testimonies of Martin and Swords to suggest a "meeting of the minds" by the parties on this issue. Their testimonies confirm that although there were several "discussions" between the parties regarding Roberts' salary adjustment, there was never any agreement that it would apply retroactively.

We believe that it is clear that the parties in this case failed to reach any agreement concerning the retroactive effect of Roberts' new compensation package, unless it can be said that Roberts' retention of the paycheck representing the retroactive pay constituted an acceptance of such. Roberts testified that he kept the check because he believed he was entitled to at least that much and more and because he needed the job. We hold that under the present circumstances, Roberts' acceptance of the paycheck as a portion of his earned compensation did not constitute an acceptance of a retroactive pay adjustment, which had the overall effect of reducing his salary. An employee's receipt of a portion of the compensation due him "does not necessarily mean that there is a waiver of the additional amount due." *Freeman v. King*, 662 S.W.2d 479, 481 (Ark. Ct. App. 1984). The question of waiver is usually one of fact. *Freeman*, 662 S.W.2d at 481. As fact finder, the trial judge failed to find that Roberts waived his right to seek additional compensation by accepting the check. We find no error in this regard and, therefore, conclude that the parties failed to agree that Roberts' new compensation package would be applied retroactively.

As we have determined that the September 30 memo does not apply to retroactively alter Roberts' compensation, we hold him entitled to the same pay structure as the preceding fiscal year. The second issue before us is, thus, whether such compensation plan included an interim bonus payment. NSA argues that the third component of Roberts' compensation package for fiscal year 1991 was an "annual" bonus "based upon certain year-end profitability calculations." NSA points to the fact that on a memorandum detailing "Dodson's Commission Structure" for May 1, 1990 to April 30, 1991, the bonus given is identified as "annual." NSA further asserts that any deviation

from its payment of such bonus other than at the fiscal year's end was due to Roberts' request, during fiscal year 1991, for certain "advances" against such annual bonus and does not operate to change the nature of that bonus.

Swords testified that it "was intended" that the bonus be paid on an annual basis. He corroborated Martin's testimony that the interim advances made Roberts on his year end bonus during fiscal year 1991 were due to Roberts' stated need and request for the funds to enable him to purchase property. Roberts denies this, stating:

> I went to Mr. Martin and we talked about it several times and his comment was a man ought to get his money when he gets it and it was not specifically to buy my sister's farm. You have to realize that my income had been cut tremendously in this change, my monthly income.

Roberts testified that for fiscal year 1991, he received an interim bonus payment representing the first two quarters. He denied that this payment was an "advance," noting that he paid income tax on it. He further stated that his profit incentive "was paid usually quarterly . . . ." Roberts said that he never discussed with NSA that the bonus was to be an annual one.

The parties do not dispute that for fiscal year 1991, Roberts' bonus payment could never be less than 75% of his sales commission. Roberts explained, "that is why [the bonus] was paid on a continual basis because there was never any chance of me having to return any of it." Martin was asked, "[s]o even if the company lost money on [its] sales, [Roberts] would still be entitled to this . . . bonus . . . of 75 percent; is that correct?", to which he replied, "[t]hat's correct." Swords testified that the interim bonus payments to Roberts in fiscal year 1991 were calculated at 75% because NSA knew that he would earn at least that amount. The parties also agree that Roberts' sales commission was paid on a monthly basis and that the sales booked each month could not subsequently come off the books.

Swords acknowledged that NSA's year end profit figures were not necessary to determine the minimum percentage of commission due Roberts. He was questioned, "you didn't need the final year-end figures, profit figures which I understand take a while to get . . . in . . . to

know that [Roberts] would be entitled to a minimum commission of [75] percent," to which he responded, "[t]hat's correct." Swords commented that the year end profit figures were useful in determining whether Roberts was entitled to more than the minimum 75%. He was further asked:

> THE COURT: . . . . In other words, the 75 percent of commissions was paid as a profit incentive regardless of the amount of profit?
>
> THE WITNESS: You could look at it that way. This was really some of the money that had been previously paid as sales commissions and you see that part of it is contingent. Seventy-five percent of it was going to be paid regardless. But if he could attain a higher profit percentage, he could get 100 percent and if he could attain a still higher profit percentage, he could attain 125 percent.

We find the record to clearly establish that in fiscal year 1991, Roberts was entitled to a bonus or "profit incentive" payment equal to no less than 75% of his sales commission. The latter was calculated monthly and once determined, could not later change because those sales did not come off the books. Thus, the amount of bonus due Roberts at any given time was readily calculable as it could never be less than 75% of his sales commission. Indeed, Swords testified that the year end profit figures were not necessary to determine the minimum percentage of commission due Roberts, but only the maximum. It is important to note here that Roberts does not seek an amount representing his bonus or "profit incentive" payment in excess of the 75% minimum.

Regardless of whether the bonus is identified as "annual" or otherwise, it was certainly paid to Roberts on less than an annual basis. Moreover, these payments were clearly based on the 75% minimum, of which Roberts was assured, and which, according to Swords, was to be paid him "regardless." The record does, however, establish that there were certain other payments to Roberts that were not tied to the 75% figure. The proof shows that these were treated as true advances by NSA, requiring a deduction from his actual bonus payments. Roberts distinguished between the two by pointing out that the two interim bonus payments received by him in fiscal year 1991 were included on his W-2 form. He further clarified that these payments were included on his W-2 in the calendar year paid, not the fiscal year. Based upon the foregoing, we find the evidence to preponderate in favor of the trial court's ruling that Roberts is entitled to be compensated in an amount representing his minimum bonus or incentive payment (75% of his sales commission) for

the months of May through September, 1991 (in addition to his actual sales commission for August -September 1991).

The judgment of the trial court is affirmed and this cause remanded for any further proceedings deemed necessary.  Costs are assessed against National Safety Associates, Inc., for which execution may issue if necessary.

_____

FARMER, J.

_____

HIGHERS, J. (Concurs)

_____

LILLARD, J. (Concurs)